**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RICHARD MACK, | ) | |
| | ) | |
| Plaintiff, | ) | No. 14 C 3945 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| CAROLYN W. COLVIN, Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Richard Mack, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and Supplemental Security Income under Title XVI of the Act. 42 U.S.C. § 1382c(a)(3)(A). Mr. Mack asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

Prompted by his family, who were becoming increasingly concerned over changes in Mr. Mack's behavior and his deepening isolation, Mr. Mack finally sought treatment in May of 2010 for recurrent headaches, vertigo, and spasms he said he had been suffering for a while. (R. 425). Family, friends, and acquaintances also had noticed aberrant, anti-social behavior for a couple of years before treatment. (R. 341-43, 734-46). His personality changed. He also lost weight and ignored his hygiene. And he stopped paying bills – to the point where his utilities were shut off and his property went into foreclosure. (R. 333-336, 345-58). In essence, Mr. Mack – who had an MBA

and, up until the company he worked for folded in 2004, was in a job that paid him $70,000 - 110,000 per year – turned into what might be described as a homeless person with psychological issues. It turned out that Mr. Mack had a large – also described as "giant" – tumor in the frontal lobe of his brain between his eyes and behind his nose – a meningioma. (R. 370-72, 383, 402). It was removed successfully in June of 2010, but Mr. Mack was still left with some residual issues like depression and memory loss.

**I.**

Mr. Mack first applied for DIB and Supplemental Security Income ("SSI") on June 25, 2010, alleging that he became disabled on May 20, 2010. (Administrative Record ("R."), at 186-193). Just two months later, he filed another application for DIB and SSI, this time claiming he became disabled on May 1, 2007, on his DIB application and May 20, 2010, on his SSI application. (R. 194, 201).[1] These were all denied (apparently in tandem) initially and on reconsideration. (R. 69-72). Mr. Mack then filed a timely request for a hearing before an administrative law judge. (R. 110-114).

An ALJ convened a hearing on October 1, 2012. (R. 15-69). Mr. Mack, represented by counsel, appeared and testified. Two medical experts – Dr. Ashwok Jilhewar and psychologist Kathleen O'Brien – and a vocational expert – Jeffrey Lucas – also appeared and testified. On December 4, 2012, the ALJ denied Mr. Mack's application for DIB, but granted his application for SSI. In order to obtain DIB, a claimant must prove he became disabled prior to the expiration of his insured status, 42 USC §423(a)(1)(A); *Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012), which for Mr. Mack meant before December 31, 2009. While the ALJ found that Mr. Mack was disabled

---

[1] Mr. Mack changed his onset date once more, to January 25, 2009, following the administrative hearing. (R. 326).

for the purposes of receiving SSI, he determined that he had not become disabled prior to December 31, 2009. (R. 83).

According to the ALJ, prior to becoming disabled on May 20, 2010, Mr. Mack had the capacity to perform a full range of sedentary work. (R. 82-83). In reaching this conclusion, the ALJ focused on the fact that, before May 20, 2010, there was no medical record to substantiate the existence of any impairment. (R. 79-81). This became the final decision of the Commissioner when the Appeals Council denied Mr. Mack's request for review of the decision on May 1, 2014. (R. 1-6). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Mack has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

**II.**

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*,

3

496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not provide a written evaluation of every piece of evidence and testimony, *Pepper v. Colvin,* 712 F.3d 351, 362 (7th Cir.2013); *Dixon*, 270 F.3d at 1176, he cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). That is, the ALJ must "provide some glimpse into her reasoning." *Dixon,* 270 F.3d at 1176. The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Id.*; *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

**III.**

While the overriding issue in this case and all Social Security disability cases is whether the ALJ's decision is supported by substantial evidence, the companion question – which, in the Seventh Circuit is just as important – is whether the ALJ adequately explained why he concluded that Mr. Mack was not disabled prior to May 20, 2010. The Seventh Circuit, speaking through Judge Posner, tells us that "we cannot uphold a decision by an administrative agency, any more than [the Seventh Circuit] can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet*, 78 F.3d at 307. In this case, even if there might be

4

substantial evidence to support the ALJ's denial of Mr. Mack's application for DIB because the onset of his disability was five months after the expiration of his insured status, the "logical bridge" is lacking.

Social Security Ruling 83-20 directs an ALJ's analysis in cases like these. *See Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000)(SSRs are binding on all components of the Social Security Administration). The Seventh Circuit summarized the ruling in *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 353 (7th Cir. 2005):

> Under SSR 83–20, an ALJ must consider three factors when determining the onset date of disabilities of a nontraumatic origin: (1) the claimant's alleged onset date; (2) the claimant's work history; and (3) medical and all other relevant evidence. See SSR 83–20 at *2. The date that the claimant alleges as an onset date should be the starting point of the analysis, and that date "should be used if it is consistent with all the evidence available." Id. at *3. The day when the impairment caused the individual to stop work is also important. See id. Nevertheless, medical evidence is "the primary element in the onset determination," and the date chosen "can never be inconsistent with the medical evidence of record." Id. at *2, *3. This does not mean that a claim is doomed for lack of medical evidence establishing the precise date an impairment became disabling. In such cases, the ALJ must "infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process" and should seek the assistance of a medical expert to make this inference. Id. at *2. Where no reasonable inference is possible based on the available evidence and additional medical evidence is not available, "it may be necessary to explore other sources of documentation . . . from family members, friends, and former employees to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition." Id. at *3.

425 F.3d at 353. When one holds the ALJ's decision up against SSR 83-20's requirements, it doesn't fare well.

First of all, the ALJ didn't even mention SSR 83-20, which even the Commissioner concedes rules the day here. [Dkt. # 24, at 4]. That omission doesn't necessarily doom the ALJ's efforts, but those efforts are rescued only if the ALJ undertook the proper analysis. *Pugh v. Bowen*, 870 F.2d

5

1271, 1274 (7th Cir.1989). Contrary to the Commissioner's stance in her brief, there is nothing in the opinion to suggest that the ALJ was aware of SSR 83-20, let alone that he followed it.

The ruling states that the starting point for determining an onset date is the claimant's alleged onset date. Mr. Mack has provided a moving target in that regard before finally settling on January 25, 2009, but as neither the Commissioner nor the ALJ looked askance at that, neither will we. In any event, the ALJ did not discuss Mr. Mack's alleged onset date. As for Mr. Mack's work history, he stopped working because his employer went out of business and he was laid off, so that adds nothing to the calculus.

Under the ruling, the primary consideration is the medical evidence – the onset date can never be inconsistent with that. But, by the same token, the ruling is clear that "[t]his does not mean that a claim is doomed for lack of medical evidence establishing the precise date an impairment became disabling." *Briscoe*, 425 F.3d at 353. Here, there was no medical evidence prior to the day Mr. Mack went in to see about his headaches and behavior in May 2010, and certainly not any around the date he chose for his onset date – January 25, 2009. But there isn't any evidence *inconsistent* with January 25, 2009, as an onset date either.

Clearly, this was a case where the ALJ had to infer an onset date. In such an instance, the ruling counsels that an ALJ should employ a medical expert to aid in making that inference. The ruling also explains that the decision-making process should take into account the "history and symptomatology of the disease process," SSR 83-20, *2, and the ALJ should look to information from "family members, friends, and former employees." SSR 83-20, *3. So, how did the ALJ in this case come up with May 20, 2010, as an onset date? According to his decision – and the Commissioner's brief [Dkt. # 24, at 4] – he chose that day, with assistance from a medical expert,

6

Dr. Jilhewar, because it was the date of Mr. Mack's "first documented medical encounter." (R. 79). But, by May 20, 2010, Mr. Mack's already had a large – or, again, in his physician's estimation, "*giant*" – frontal lobe tumor. Surely, the meningioma did not suddenly appear, "giant"-sized, on May 20, 2010. Even Athena had a gestation period before springing fully grown and armored from Zeus's head. Significantly, Dr. Jilhewar, the medical expert who testified at the hearing, conceded that such tumors are "[s]low growing." (R. 36-37). This far, at least, he agreed with the opinions expressed by Dr. Yvonne Curran and Dr. Manish Kapadia – a neurologist – who began treating Mr. Mack some time after his surgery. (R. 710).

Clearly, neither the ALJ nor Dr. Jilhewar gave any consideration to "the history and symptomatology of the disease process." In his testimony, Dr. Jilhewar focused on the fact that there was no medical record prior to May 20, 2010. (R. 29, 32, 34). He specifically said he based his opinion "on medical records only." (R. 34, 35). The ALJ never asked him whether he could, or even would, offer an opinion as to the onset of Mr. Mack's condition given the "slow growing" nature of the meningioma. But any moderately competent physician would have had an informed opinion on that issue.

But Mr. Mack's treating doctors did. They opined that, "[g]iven the slow growing nature of this tumor, the cognitive changes can certainly be ongoing for several years. The location of this tumor was certainly in area that controls several different cognitive domains." (R. 710). Incredibly, the ALJ dismissed this opinion out of hand, saying that it was "speculative and not based on medical records." (R. 79). Yet, unlike Dr. Jilhewar's opinion, or any of the evidence the ALJ did consider, it *was* based on medical knowledge about how a meningioma progresses and the symptoms that result. In other words, it took into account "the history and symptomatology of the disease process,"

7

just as SSR 83-20 directs. The ALJ's rejection did precisely the opposite.

The ALJ's demand for medical records to support a medical opinion as to the onset of a disease flies in the face of SSR 83-20. The ruling is designed in part to address situations where there are no medical records establishing an onset date. Again, as the Seventh Circuit said, the absence of medical records does not doom a claim. *Briscoe*, 425 F.3d at 353. The fact that the ALJ chose an onset date based on the date of the first medical report, and inexplicably rejected the only medical opinion in the record addressing the onset of Mr. Mack's tumor and attendant symptoms because there were no medical records to support it, shows that he ignored the dictates of SSR 83-20, not that he followed them as the Commissioner seems to believe.[2]

Then there are the statements from family, friends, and acquaintances. They come from Mr. Mack's mother, his sister, a former female friend, a former male friend, a maintenance worker at Mr. Mack's condominium, a doorman at the condominium building, and a manager at a restaurant where Mr. Mack had been a regular. (R. 341-43, 734-746). This is a diverse group, with varying degrees of affinity for Mr. Mack and varying degrees of acquaintance, but their accounts of what happened to Mr. Mack are rather consistent. As already noted, to put it colloquially, sometime around 2007, Mr. Mack was going off the rails. As with the opinion from Mr. Mack's doctors, the ALJ rejected these seven rather detailed statements rather cavalierly, saying they were:

> too uncertain as to the dates and the specifics. *No weight* is given to these third party

---

[2] The ALJ's demand for medical records to establish an onset date in this case is somewhat analogous to – although far worse than – some ALJs' penchant for demanding medical evidence as necessary to support a claimant's allegations of pain and other disabling symptoms. The Seventh Circuit has criticized this tendency over and over again. *See, e.g., Adaire v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015); *Williams v. Colvin*, 757 F.3d 610, 614-15 (7th Cir. 2014); *Thomas v. Colvin*, 745 F.3d 802, 806-07 (7th Cir. 2014); *Moore v. Colvin*, 743 F.3d 1118, 1125 (7th Cir. 2014); *Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014).

8

statements for the period prior to May 20, 2010 without documented medical evidence.

(R. 79)(emphasis supplied). We have already addressed the ALJ's demand for medical evidence and why it does not jibe with SSR 83-20. But we'll address the ALJ's characterization of these statements as "uncertain as to dates and specifics."

We'll begin with a couple of individuals who are unrelated to Mr. Mack and know him only through their jobs. Mr. Mack's doorman, Mr. Donalson, said that he:

> noticed a lot of changes with [Mr. Mack] in 2009. Mr. Mack started to lack in the hygiene area. He was not changing clothes or getting haircuts, and before long he had a full grown beard. Mr. Mack started to complain to me about headaches and how he thought he was blacking out. He explained that he would sit down to read a book when it was daylight and the next thing he knew it would be dark outside and he still haven't [sic] gotten through the book. He started to spend a lot of time in his apartment because he was scared he would blackout in public.

(R. 343). Mr. Donalson went on to describe how Mr. Mack lost weight because he didn't have money for food and how he "watch[ed] Mr. Mack's state of mind gradually change and almost diminish right in front of my eyes. (R. 343).

Mr. Reynolds, the manager at the restaurant Mr. Mack frequented, who would not seem to have any particular bias, had similar experiences:

> I would like to note that during the 2009 to 2010 period, his demeanor began changing, as he was less talkative than usual and he began to grow a beard and let his hair grow out. After a while it was clear he was not maintaining his beard or hair and I began to question the change as I have never [Mr. Mack] to have a beard or long hair. Given his profession, [he] was always very professionally groomed and took pride in his appearance.

(R. 342). Mr. Reynolds also noted the complaints of headaches, loss of weight, and inattention to hygiene. (R. 342). Granted, the statements do not provide specific dates – just the years, but no one

9

would remember specific dates.³ Moreover, they are consistent as to the description of what was going on, and in their undermining of the ALJ's selection of May 20, 2010, as the onset of Mr. Mack's disability. Also, one must recall that these statement came from acquaintances rather than those in Mr. Mack's family or social circle. The statements from those individuals are far more lengthy and detailed.

Mr. Durston was one of Mr. Mack's friends. He had know him since 2001. He started noticing changes as early as 2005:

> About 4 years later April, 2005, I noticed that he started exhibiting irritable and angry behavior. At first, it was a lot of complaining which then progressed into verbal abuse directed at many of us, which is completely unlike him. He also became more distant. He was not answering or returning phone calls and participating in our usual get-togethers. Over time, one by one, his friends turned away. At times he made up outrageous stories / conspiracies about other people that I was able to verify later were to true. We did not know what was going on and neither did Richard. It was a gradual change. Reluctantly, I had to stop associating with him in July 2005. This was really hard, because Richard was like a brother to me.
>
> Later on, we (our circle of friends) actually thought he might have a drug or alcohol problem. An intervention was discussed. I was afraid to get involved because I thought Richard was angry with me. The last of our circle of friends Michelle stopped associating with him around February 2007. He was really abusive to her in the end.

(R. 739).

Another of Mr. Mack's friends, Ms. Sacrey, also provided an account of his downward spiral, She had met him in 2002, when he was very "outgoing and well-respected" and was something of

---

³ If they had, the ALJ would no doubt have rejected their testimony as contrived on the theory that memory is fallible and often plays tricks and conforms to the witness's self interest. In short, that it was too precise, *cf. Nelson-McGourty v. L & P Financial Adjusters Inc.*, 2010 WL 3190711, 9 (N.D.Ill. 2010), and thus it was improbable that the witness would have remembered the events with such clarity. *Cf. K & K Jump Start/Chargers, Inc. v. Schumacher Elec. Corp.*, 82 F.Supp.2d 1012, 1018 (W.D.Mo. 2000).

an organizer and social leader in the group. But, over the next five years she witnessed disturbing changes, saying that he "went from being smart, witty and charismatic to being sharp-tongued, rude, and aggressive." (R. 741). Consistent with Mr. Durston's statement, Ms. Sacrey reported that:

> By the winter of 2007 Richard had lost most of his friends. I, too, was having a hard time keeping the friendship going. Our group began to privately discuss issues about him. We thought maybe he had a drug or alcohol problem. At one point, I tried to organize an intervention, but so many of our friends had just given up on Richard and moved on.

(R. 741). She went on to describe one particular evening she spent with Mr. Mack:

> Finally, I had to walk away from Richard as well. That winter we had attended a Bulls game where we had seats behind the basket. As the evening progressed, he became belligerent and aggressive, so much so that other spectators noticed and became concerned for my welfare. He became very agitated because I was laughing and punched me. We left the game, got into a cab and went to meet our friend Michelle. When we reached the restaurant, I told Michelle about the incident, got into another cab and left.

(R. 741). While neither Mr. Durston nor Mr. Sacrey – writing a few years after their experiences – were able to provide exact dates, their statements are rather detailed descriptions of certain exemplary events and sufficiently pinpoint the times of the occurrences. Mr. Mack's sister provided a thorough narrative of how she perceived the changes in Mr. Mack and how she and her mother finally got him to get medical treatment. She was rather specific with details:

> To the best of my recollection, with the exception of two emails in 2008, Richard did not respond to my emails.
>
> \*   \*   \*
>
> In October 2008, my brother sent my mother an email requesting $20,000 to help him. My mother forwarded the email to me, but my brother did not attempt to reach me with a similar request. After receiving the email from my Mom, I wrote my brother letting him know he could move in with me until he got back on his feet. He did not take me up on my offer. I also sent him a couple hundred dollars.

* * *

> In July 2009, I finally saw my brother one time. I was in Chicago for business. I called Richard to see if he wanted to meet for dinner. I was not surprised when he, once again, did not answer my call. I went to his condo with the intent of camping out in his lobby until he would hopefully agree to see me. When I arrived, the lobby guard told me that Richard had just left a few minutes earlier.

(R. 734). As Mr. Mack's sister describes it, she was taken aback when she finally saw him:

> He had grown a short beard. While this may not be odd on many people, my brother has always been a clean-cut guy, wearing his hair short and no beard. To my knowledge, he did not like any facial hair. When I later asked him about it, he told me that he could not shave because the power in his condo had been shut off (as explained below). His bathroom has no natural light and he cold not see sufficiently to shave.
> Richard's behavior on this night was bizarre and not like the brother I knew. After not seeing Richard for so long, I, of course, asked him how he was doing. Richards responded VERY loudly and with anger, "I'M DEAD!"
> * * *
>
> Richard then launched into a very long story regarding Complaint Ed's efforts to keep him without power. I do not recall everything he told me, but it was very "*conspiracy theory*" sounding and not terribly believable. Richard also indicated that someone at Complaint Ed had it out for him personally and was thwarting his efforts to have his power turned back on. Richard denied that he owed Complaint Ed money, but he indicated that Complaint Ed required a $400 deposit before the power would be turned back on. I gave Richard a check for $400 so that he could have his power turned back on.

(R. 735). She did not see him again until March 2010, by which time he had fallen into further disarray physically and psychologically. (R. 735-36). While the dates provided are not down to the day, they are down to the month, and certainly the accounts of conversations and money are rather laden with details.

Finally, Mr. Mack's mother – perhaps not surprisingly – provided the lengthiest and most detailed statement of all; and the most touching. She began by lamenting the fact that she had no

idea that when she saw her son at Christmas in 2006, she would not see him again until June 2, 2010, when she took him in for pre-op testing at Northwestern Memorial Hospital. (R. 743). Mr. Mack's mother began to notice changes in 2006, as her son's contact with her became more and more sporadic. He ignored her emails and calls and when he did not, he was angry and irritable and spoke little of his activities and friends. (R. 743). Her account of what transpired after that is rather specific and detailed. Written two to four years after the events, it's difficult to see how it could be more so:

> After Richard stopped calling me, I had sporadic e-mail contact with him. His e-mails ran hot and cold. Sometimes thee-mails were nice, but usually they were angry, insulting, and upsetting. I received an e·mail from Richard on October 31, 2008, where he indicated he is completely out of cash and needs help; because at this point eating had become a serious issue. He could use anything but he estimated he would need $20,000. Richard would have known that I do not have this kind of money. I was willing to explore taking out *a* loan, but wanted more information from him, which I requested. In the meant time, I sent him $850 and [his sister] sent money as well. Richard thanked me for sending the money and indicated he would send me the information I requested. However, this never happened.
>
> No further communication happened with Richard until June 2, 2010, with one exception being a Mother's Day e-card on May 10, 2009. I was so happy just to have a sign of life, which gave me hope.
>
> I traveled to Chicago 5/29-6/2/09 looking for my son as it was clear something was seriously wrong. sent an e-mail that I was coming and hoped he would have lunch and/or dinner with me. (I was treading carefully, not wanting to alienate him.) I called Richard, but he did not answer and his voice mail was full as usual. So, I waited in his condo building lobby numerous times. I searched for him in local restaurants, hoping to find him. I also searched for his car in the parking garage. I found it crusted with dirt, the license plate tags expired 2/09, and the tires were flat. I also drove to his home in Streamwood to see if he was there. I found a 6 month old advertisement from Osco Drug dated 12/26/08 to 1/1/09 in his mail box. My worries and anxiety continued to grow, What has happened to Richard! The grief I was feeling as a Mother is indescribable. I returned to Florida completely dejected and worried beyond words as to what has happened to my Son. I would not see or speak with him until June 2, 2010.

(R. 744). The account from Mr. Mack's mother continues, but this much is provided to point out

that, in the main, the statements from Mr. Mack's friends and family are anything but "uncertain as to dates and specifics." (R. 79). The ALJ's professed reasoning for disregarding them completely is unfounded and unfathomable.

Given the ALJ's glaring failure to follow SSR 83-20, and his dismissive treatment of the opinions from Mr. Mack's doctors and statements from his friends and family, this case must be remanded to the Commissioner. This is not to say that Mr. Mack was definitely disabled before his insured status ran out, but merely to say that the ALJ did not follow the rules in determining he was not, and certainly did not provide the necessary logical bridge between the evidence and his conclusions. The ALJ need not have built the Pont Neuf. A simple span would have sufficed so long as it allowed the reviewing court to traverse the divide between the evidence and the conclusions. Here, the absence of explanation made that impossible. If nothing else, it can be said that it is a medical impossibility that the onset of Mr. Mack's disability was the date the ALJ chose. As of that date, it is beyond any reasonable doubt that he was already suffering the effects of a "giant" meningioma. It is contrary to undisputed medical science that the meningioma simply sprang into existence, fully formed, on May 20, 2010.

## CONCLUSION

The plaintiff's motion for remand [Dkt. #17] is GRANTED, and the Commissioner's motion for summary judgment [Dkt. #232] is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 12/10/15